IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

ROGER KELSO, individually and on behalf of  )
all others similarly situated,              )
                                            )
            Plaintiff,                      )
                                            )
    v.                                      )   Case No. 03-769 (MJR)
                                            )
COLUMBIA ACORN TRUST and COLUMBIA           )
WANGER ASSET MANAGEMENT, LP,                )
                                            )
            Defendants.                     )

## MEMORANDUM IN SUPPORT OF DEFENDANT COLUMBIA ACORN TRUST'S MOTION TO DISMISS

Defendant Columbia Acorn Trust ("Acorn Trust"), by its attorneys, respectfully submits this memorandum in support of its motion to dismiss the Complaint for failure to state a claim upon which relief can be granted.

**A.     The Parties**

Acorn Trust is a Massachusetts business trust with its principal place of business in Chicago, Illinois. (Compl. ¶ 6.) It is a registered open-end management investment company, commonly called a mutual fund, offering shares in series of various funds--one of which is the Columbia Acorn International Fund ("Acorn International" or the "Fund"). (Id.) Defendant Columbia Wanger Asset Management ("WAM") is a Delaware partnership with its principal place of business in Chicago, Illinois. (Compl. ¶ 7.) Through an investment advisory agreement with Acorn Trust, WAM is responsible for managing and supervising Acorn International's portfolio of securities. (Id.)

Plaintiff Kelso is alleged to be an owner of shares in Acorn International and purports to sue on behalf of himself and a putative class of *all* investors who have *at any time* "owned shares of Columbia Acorn International" continuously for more than 14 days from the date of purchase to the date of sale (redemption) or exchange. (Compl. ¶ 39.)

B.   **Summary Of The Allegations Of The Complaint**

The Complaint alleges that shares of open-end mutual funds are sold to and may be redeemed by investors at a price based upon the net asset value per share ("NAV") of the fund. (Compl. ¶ 11) NAV is alleged to be calculated by deducting fund liabilities from the total value of the assets (consisting of portfolio securities and cash) held by the fund, divided by the number of fund shares outstanding. (Compl. ¶ 12.) Thus, changes in the value of fund assets impact the NAV of fund shares, and hence the price at which fund shares may be purchased or redeemed by investors. (Compl. ¶¶ 31-33, 36.)

The Complaint alleges that defendants violated Section 36(a) of the Investment Company Act of 1940 (the "ICA"), and were negligent and "willfully and wantonly breached their duties" in calculating once daily (at 4:00 p.m. EST) the NAV of Acorn International shares based upon the last trade price in the home market of the foreign securities in the Fund's portfolio. (Compl. ¶¶ 13, 14, 53, 57, 62.) More specifically, plaintiff alleges that defendants fail to take into account (by adjusting NAV for) information affecting the value of portfolio securities that becomes available after the close of the foreign exchanges on which those portfolio securities trade but before the time the NAV of Acorn International shares is calculated (normally 4:00 p.m. EST). (Compl. ¶¶ 14, 30-31, 37.) The Complaint alleges that by "failing to make daily adjustments" to NAV based upon alleged "positive correlations" between movements in the U.S. domestic securities markets and foreign securities markets, defendants have created opportunities for market timing traders to purchase fund shares at a "discount," or to redeem fund shares at a "premium." (Compl. ¶¶ 31-33, 53, 57, 62.)[1]

---

[1]   Plaintiff contends that in calculating NAV, defendants should have made adjustments to the closing prices of foreign portfolio securities to reflect upward or downward movements in the *United States* domestic securities markets based upon an alleged "positive correlation between value movements in the United States market and value movements in foreign markets." (Compl. ¶¶ 15, 31.)

The Complaint alleges that as a result of trading by market timers, *Fund* cash is reduced, the *Fund* incurs increased trading and transaction costs, and the *Fund's* investment strategies are disrupted. (Compl. ¶¶ 31, 36, 38.) The only direct injuries alleged in the Complaint are to the Fund itself; no individual or direct injury to plaintiff Kelso (or any other Fund shareholder) is alleged.

C.   **Summary Of The Grounds For Dismissal**

    i.   **Plaintiff Has No Standing to Allege a Section 36(a) Violation.**

Count I of the Complaint purports to assert a claim under Section 36(a) of the ICA, 15 U.S.C. § 80a-35(a). However, Section 36(a) does not provide a private right of action against Acorn Trust. Rather, unlike other sections of the ICA (*see, e.g.,* Section 36(b)), Section 36(a) authorizes *only* the Securities and Exchange Commission ("SEC") to bring an action. Thus, plaintiff does not have standing to assert a claim under the legal theory pleaded in Count I.

    ii.   **Plaintiff's Claims Are Derivative in Nature, Requiring Demand.**

Plaintiff's claims arising from an alleged failure to "properly" value Fund portfolio securities are derivative in nature, and not claims for direct or special injury to any particular shareholder such as plaintiff. That is, the claim that Acorn International was exposed to "market timing," resulting in the general dilution of and increased costs to "Defendants' fund assets," belongs to the Fund itself and may be asserted only derivatively on its behalf. Lapidus v. Hecht, 232 F.3d 679, 683 (9th Cir. 2000); *see also* Meyers v. Brinson Advisors, Inc., No. 02-CV-0222 (S.D. Ill. July 22, 2002) (Herndon, J.) (allegations of plaintiff mutual fund shareholders that excessive fees were paid by a fund to its investment advisor held to be derivative in nature). (A copy of the Memorandum Order in Meyers is attached hereto as Exhibit A.)

Because the claims asserted in the Complaint are derivative in nature, plaintiff was required under applicable Massachusetts law to make a demand upon Acorn Trust before filing suit. The Complaint fails to contain any demand allegations.

### iii.   Even if "Direct" in Nature, Plaintiff's Claims Are Legally Deficient.

Regardless of whether the claims asserted in the Complaint are classified as direct or (as they clearly are) derivative in nature, those claims are not actionable absent allegations that defendants calculated the NAV of Acorn International shares in a manner violative of the ICA, and the rules promulgated by the SEC under the ICA, which exclusively govern the calculation of NAV for purposes of the sale and redemption of mutual fund shares. 15 U.S.C. § 80a-2(a)(41) and § 80a-22(c); 17 C.F.R. §§ 270.2a-41, 270.22c-1 and 270.22e-2. The Complaint fails to contain any such allegations, nor does it allege that the ICA and SEC rules require that the NAV of foreign portfolio securities must be adjusted to reflect every upward or downward movement in the U.S. domestic securities markets, as plaintiff appears to suggest.

Additionally, the Securities Litigation Uniform Standards Act of 1998, 15 U.S.C. §§ 77p, 78bb(f), *et seq.* ("SLUSA"), requires the dismissal of any "covered class action based on the statutory or common law of a state" alleging a misrepresentation or omission of material fact in connection with the purchase or sale of a "covered security," or that the defendant employed a manipulative or deceptive device in connection with such a purchase or sale. If the Complaint were construed to state claims based upon manipulative conduct by defendants causing direct injury to Fund shareholders, the dismissal of plaintiff's claims would be required under SLUSA.

### iv.   As Pleaded, the Complaint Asserts Claims Which Would be Time-Barred.

The Complaint broadly defines the putative class as "all persons in the United States who have owned shares of Columbia Acorn International for more than 14 days from the date of purchase to the date of sale (redemption) or exchange ('long term shareholders')." (Compl. ¶ 39.) Plaintiff Kelso is alleged to have owned Acorn International shares "[a]t all times relevant herein," with no indication of the date or dates on which he purchased Fund shares. (Compl. ¶ 8.) Absent any limitation on the time period covered by the Complaint, the claims asserted by plaintiff appear to

reach back to the inception of Acorn International *in 1992*. The Complaint thus purports to include claims, potentially including plaintiff Kelso's claim, which would be time-barred as a matter of law.

## ARGUMENT

### I. PLAINTIFF DOES NOT HAVE STANDING TO ASSERT A SECTION 36(a) CLAIM.

In Count I, plaintiff purports to assert a class claim against Acorn Trust under Section 36(a) of the ICA, 15 U.S.C. § 80a-35(a). Specifically, plaintiff alleges that Acorn Trust breached duties owed "as skilled specialists in the field of investment management" by failing both to adjust Acorn International's NAV per share on a daily basis and to "implement Columbia Acorn International's portfolio valuation and share pricing policies and procedures," thereby allegedly benefiting market timers "at the expense of long term shareholders." (Compl. ¶¶ 50, 53.) However, Section 36(a), unlike other sections of the ICA, expressly authorizes only *the SEC* to bring an action under that section.

Section 36(a) provides, in relevant part, as follows:

> (a)   The Commission is authorized to bring an action in the proper district court of the United States, or in the United States court of any territory or other place subject to the jurisdiction of the United States, alleging that a person serving or acting in one or more of the following capacities has engaged within five years of the commencement of the action or is about to engage in any act or practice constituting a breach of fiduciary duty involving personal misconduct in respect of any registered investment company for which such person so serves or acts:
>
> (1)   As officer, director, member of any advisory board, investment adviser, or depositor;

15 U.S.C. § 80a-35(a) (emphasis added). Thus, by its express terms, Section 36(a) authorizes only the SEC to bring an action for a breach of duty involving "personal misconduct."[2]

---

[2]   While jurisdictions which have considered the question are split on whether a private right of action may be implied under Section 36(a), recent Supreme Court precedent "has cast doubt on the type of analysis that courts have used to find implied rights of action." Boland v. Engle, 113 F.3d 706, 715 n.9 (7th Cir. 1997) (*citing* Central Bank of Denver v. First Interstate Bank of Denver, 511 U.S. 164, 184-88 (1994)).   The Seventh Circuit has not decided the issue of whether an implied

5

The section of the ICA immediately following Section 36(a) expressly authorizes a private right of action. *See* 15 U.S.C. § 80a-35(b) (private right of action for "breach of fiduciary duty in respect of...compensation or payments paid" to an investment advisor). "It is a fundamental rule of statutory construction that '[w]hen Congress includes a specific term [or provision] in one section of a statute but omits it in another section of the same Act, it should not be implied where it is excluded." Cable TV Fund 14-A, Ltd. v. City of Naperville, No 96 C 5962, 1998 WL 320363, at *2 (N.D. Ill. June 12, 1998) (*citing* Russello v. United States, 464 U.S. 16, 23 (1983)); *see also* Clay v. United States, 537 U.S. 522, 528 (2003). This is especially true where, as here, the "very next statutory section" or "subpart" of a statutory section omits particular language. *See* Cervantes-Ascencio v. United States Immigration and Naturalization Serv., 326 F.3d 83, 86 (2d Cir. 2003); McNutt v. Bd. of Trs. of the Univ. of Ill., 141 F.3d 706, 709 (7th Cir. 1998).

Thus, in light of the unmistakable difference in the standing conferred by Sections 36(a) and 36(b), no private right of action can be implied under Section 36(a) of the ICA. Count I accordingly should be dismissed.

## II. THE COMPLAINT MUST BE DISMISSED FOR FAILURE TO ALLEGE COMPLIANCE WITH, OR PROPERLY ESTABLISH EXCUSE FROM, THE DEMAND REQUIREMENT IMPOSED BY MASSACHUSETTS LAW.

### A. Plaintiff Kelso's Claims Are Derivative In Nature.

Plaintiff alleges that the purported failure to "properly" value Acorn International's foreign portfolio securities afforded opportunities for market timed trading activity which resulted in the dilution of *Fund assets* (Compl. ¶ 36), increased trading and transaction costs *to the Fund* (Compl. ¶ 38), and other adverse effects *on Fund* operations and performance. (Id.) The Complaint explains

---

right of action exists under Section 36(a) of the ICA. *See* Green v. Nuveen Advisory Corp., 295 F.3d 738, 744 n.9 (7th Cir. 2002).

how these alleged direct injuries *to the Fund* purportedly caused indirect injury to Fund shareholders by reducing ("diluting") Fund assets (cash) considered in calculating the NAV of their shares:

> When market timing traders are able to buy shares at a discount, ***Defendants' fund assets suffer dilution*** because the cash received by the fund for the shares purchased is less than the per share value of the underlying foreign securities because of the stale pricing utilized by Defendants. Likewise, when market timing traders are able to sell (redeem) shares at a premium, ***Defendants' fund assets suffer dilution*** because the cash paid out by the fund for the shares redeemed is more than the per share value of the underlying securities, again due to the stale pricing utilized by Defendants. In both instances, when Defendants receive less cash when issuing and pay out more cash when redeeming market timing trader shares than supported by the value of their underlying foreign securities, the result is ***a dilution of Defendants' cash***. Since the cash held by the fund is one of the assets that is valued in setting the Defendants' daily fund NAV, it follows that ***the diluted fund cash position causes the NAV to be diluted as well***. Due to the stale pricing utilized by Defendants, long term buy and hold shareholders have incurred ***a dilution in the NAV of their shares*** and the wealth represented by that diluted amount has been transferred to market timing traders

(Compl. ¶ 36) (emphasis added). If Acorn International did sustain the injuries alleged in the Complaint, any claim belongs to the Fund itself, whose assets allegedly were diluted, and *not* to individual shareholders who were injured, if at all, only indirectly.

"The question whether a suit is derivative by nature or may be brought by a shareholder in his own right is governed by the law of the state of incorporation." Kennedy v. Venrock Assocs., 348 F.3d 584, 589 (7th Cir. 2003). *See also* Green v. Nuveen Advisory Corp., 186 F.R.D. 486, 489 and n.2 (N.D. Ill. 1999) (applying Massachusetts law governing derivative suits in denying certification of shareholder class in action against a mutual fund organized as a Massachusetts business trust). Here, Massachusetts law governs because Acorn Trust is organized as a business trust under the laws of that state.[3] (Compl. ¶ 6.)

---

[3] A business trust, unlike other forms of trusts, is a legal entity. *See* MASS. GEN. LAWS CH. 182, § 6; *see also* Morrison v. Lennett, 616 N.E.2d 92, 94 and n. 7 (Mass. 1993).

Under Massachusetts law, a claim for diminution in the value of shareholder investments as a result of a reduction in corporate assets, as alleged here, is derivative in nature and may not be pursued in a direct shareholder action. *See* Jackson v. Stuhlfire, 547 N.E.2d 1146, 1148 (Mass. App. Ct. 1999) (defendants' alleged conduct "adversely affects [plaintiffs] merely as they are the owners of the corporate stock"). *See also* Lapidus v. Hecht, 232 F.3d 679, 683 (9th Cir. 2000); Green, 186 F.R.D. at 489-90 (applying Massachusetts law); Houser v. River Loft Assoc. L.P., No. Civ. A 98-4312B, 1999 WL 33594570, at *3 (Mass. Super. Ct. Mar. 15, 1999). Delaware law, relied on by Massachusetts courts for guidance on derivative actions,[4] similarly holds that claims for diminution in shareholder value are derivative in nature. *See* Kramer v. W. Pac. Indus., Inc., 546 A.2d 348, 351 (Del. 1988) ("where a plaintiff shareholder claims that the value of his stock will deteriorate and that the value of his proportionate share of the stock will be decreased as a result of alleged director mismanagement, his cause of action is derivative"); Brug v. Enstar Group, Inc., 755 F. Supp. 1247, 1257 (D. Del. 1991) (a claim based upon a decrease in the value of stock which falls equally on all stockholders must be brought as a derivative action).

The Seventh Circuit has noted that several other Circuits similarly have affirmed the dismissal of shareholder actions alleging, as here, a diminution in value of their shares as the alleged result of defendants' conduct. *See* Flynn v. Merrick, 881 F.2d 446, 450 (7th Cir. 1989) (*citing* Rand v. Anaconda-Ericsson, Inc., 794 F.2d 843, 849 (2d Cir. 1986) ("any decrease in value of plaintiffs' shares merely reflects the decrease in value of the firm as a result of the alleged illegal conduct" and does not confer standing upon shareholders); Warren v. Mfrs. Nat'l Bank of Detroit, 759 F.2d 542 (6th Cir. 1985) (plaintiff principal stockholder in a corporation did not have standing to bring a fraud claim alleging that his investment became worthless due to the bankruptcy of the corporation);

---

[4]   *See* Houle v. Low, 556 N.E.2d 51, 59 (Mass. 1990).

Roeder v. Alpha Indus., Inc., 814 F.2d 22, 29-30 (1st Cir. 1987) (plaintiff shareholders' allegations that a bribe to obtain subcontracts caused the market price of defendant's stock "to be worth less and to decline" were derivative in nature); Rose v. Schantz, 201 N.W.2d 593, 597-98 (Wis. 1972) (while defendants' alleged diversion of corporation's cash reserves clearly "may have a subsequent impact on the value of the shareholders' shares," the court held it did not "create a right to bring a direct, rather than derivative, action"). *See also* Strougo v. Bassini, 282 F.3d 162, 174 (2d Cir. 2002) (payment of fees which had the effect of depleting mutual fund assets and thereby decreasing share price was "precisely the type of injury to the corporation that can be redressed under Maryland law only through a suit brought on behalf of the corporation").[5]

The determination of whether plaintiff's claims here are direct or derivative in nature turns on whether plaintiff's alleged injury is distinct from the injury suffered generally by other shareholders of the defendant entity. Lapidus, 232 F.2d at 683-84; Green, 186 F.R.D. at 489. In making this analysis, the Court must consider *the nature of the wrong plaintiff alleges in the body of the Complaint*. *See* 12B WILLIAM FLETCHER, FLETCHER CYCLOPEDIA OF PRIVATE CORPORATIONS, § 5911 (2003). Here, any alleged injury to plaintiff could have derived only from an injury sustained by the Fund in which he held shares, and was not distinct from any injury purportedly suffered generally by all Acorn International shareholders--each of whom would be affected equally

---

[5] In other mutual fund cases, plaintiffs have purported to rely upon Strougo for the proposition that their claims are direct, rather than derivative, because, supposedly, an alleged reduction in the value of their mutual fund investments did not result from a reduction in funds assets but rather from a reallocation of equity value to market timing traders who bought the funds' undervalued shares. But any such characterization of plaintiff Kelso's claim here would be contrary to the express allegations of his Complaint, which assert a claim for dilution of the NAV of plaintiff's shares as a result of a reduction *in Fund assets* allegedly due to the trading activity of "market timers." (Compl. ¶ 36.) Thus, that portion of the Strougo opinion regarding the assertedly direct nature of injuries resulting from a coercive rights offering by a closed-end investment fund which did *not* stem from "a reduction in the value of the Fund's assets or any other injury to the Fund's business" is completely inapposite here. 282 F.3d at 175-76.

according to their respective ownership interests. Consequently, the claims asserted in the Complaint are derivative in nature. *See* Brug, 755 F. Supp. at 1257.

### B. Massachusetts Law Requires A Plaintiff In A Derivative Action To Allege Demand Or Establish With Particularity Demand Futility.

In Kamen v. Kemper Financial Services, Inc., 500 U.S. 90, 108-09 (1991), the United States Supreme Court held that state law properly regulates the allocation of corporate powers between directors and individual shareholders, and hence governs the circumstances under which shareholder demand is required as a prerequisite to suit on a claim properly belonging to the corporation (*i.e.*, a derivative claim). Before maintaining a derivative suit, a shareholder under Massachusetts law must make a demand on the corporate directors and, if necessary, the shareholders, that they cause the business entity itself to file an action for management wrongdoing. *See* Mass. R. Civ. P. 23.1; Harhen v. Brown, 730 N.E.2d 859 (Mass. 2000). Such a demand is excused only when it is clear that it would be futile under the circumstances. Harhen, 730 N.E.2d at 865. Furthermore, Fed. R. Civ. P. 23.1 and Mass. R. Civ. P. 23.1 both provide that:

> The complaint shall also allege *with particularity* the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and, if necessary, from the shareholders or members, and *the reasons* for his failure to obtain the action or for not making the effort.[6]

*See also* Jackson, 547 N.E.2d at 1148 (primary basis for dismissing the plaintiff's direct claims against the defendant corporation rested on their "failure to allege with particularity their efforts to obtain the action desired from the defendants...or to explain the futility in making such effort, as required by rule 23.1").

In this case, the Complaint makes no allegation that plaintiff made demand upon Acorn Trust

---

[6] Fed. R. Civ. P. 23.1 further requires that the complaint be verified and allege, *inter alia*, that plaintiff was a shareholder at the time the complained of conduct occurred.

or its trustees to bring suit for the alleged mismanagement of its investment advisor prior to filing suit, nor does it make any effort to explain why demand should be deemed futile. As a consequence, plaintiff's claims should be dismissed for failure to comply with both Massachusetts and federal law.

### III. THE COMPLAINT FAILS TO ALLEGE THAT ACORN TRUST CALCULATED THE NAV OF ACORN INTERNATIONAL SHARES IN A MANNER VIOLATIVE OF THE ICA AND THE SEC REGULATIONS PROMULGATED UNDER THE ICA.

The method of calculating current NAV for purposes of the sale and redemption of Fund shares is set forth in and governed by the ICA and in SEC Rules promulgated thereunder. *See, e.g.*, 15 U.S.C. § 80a-2(a)(41) and § 80a-22(c); 17 C.F.R. §§ 270.2a-4, 270.22c-1 and 270.22e-2. With respect to the assets of registered investment companies (like Acorn Trust), Section 2(a)(41)(B) of the ICA defines "value" to mean: "(i) with respect to securities for which market quotations are readily available, the market value of such securities; and (ii) with respect to other securities and assets, fair value as determined in good faith by the board of directors." 15 U.S.C. § 80a-2(a)(41)(B). Thus, where market quotations (such as closing market prices) of the foreign securities held in a mutual fund's portfolio are "readily available," those prices *must* be used by the mutual fund in computing NAV--not some other price based on a different measure of value. It is only when market quotations are deemed not "readily available" that some other measure of value--determined in good faith by the fund's board of directors--is permissible or required.

This definition of "value" under the ICA is incorporated nearly verbatim into SEC Rule 2a-4. That Rule provides that "[t]he current net asset value of any redeemable security issued by a registered investment company...means an amount which reflects calculations...made substantially in accordance with" among, other things, value (as defined in Section 2(a)(41)(B) of the ICA), and permits the use of estimates "where necessary or appropriate." 17 C.F.R. § 270.2a-4. The Rule goes on to address how changes in holdings of portfolio securities, changes in the number of outstanding

11

shares (resulting from distributions, redemptions and repurchases), expenses, dividends and interest income are to be reflected in the computation of NAV. (The Complaint in this case itself implicitly acknowledges and incorporates SEC Rule 2a-4, in that it refers to "applicable published rules and regulations concerning the calculation of NAV." (Compl. ¶ 62(a).)) Another Rule prohibits mutual funds from selling, redeeming, or repurchasing fund shares "except at a price based on the current net asset value of such security" computed after the receipt of a tender of shares for redemption or an order to purchase or sell shares. 17 C.F.R. §270.22c-1.

The ICA and the Regulations issued by the SEC together occupy the entire field of NAV calculation for purposes of the purchase and redemption of mutual fund shares, leaving no room for state regulation of NAV calculation through the *ad hoc* application of state fiduciary law and other common law principles.[7] Subjecting the method for determining NAV to conflicting state case law would disrupt the federal regulatory scheme, under which there can be only a *single* nationwide NAV of fund shares. *See, e.g.* Burks v. Lasker, 441 U.S. 471, 480 (1979) (court must consider whether state rule is "consistent with the policy of the ICA"); Time Warner Cable v. Doyle, 66 F.3d 867, 878-79 (7th Cir. 1995) (Wisconsin law prohibiting unfair trade practices was preempted by FCC regulation which permitted cable operators to engage in practice in question).[8]

The Complaint contains no allegations that the valuation methodology plaintiff would have

---

[7] The ICA contains an express finding by Congress that investment companies "are affected with a national public interest...." 15 U.S.C. § 80a-1. Section 1(b)(5) of the ICA specifically declares that "the national public interest" is affected by methods used by investment companies *to compute their NAV*.

[8] This is not to say that the ICA preempts all state common law claims and remedies in the mutual fund context; it does, however, preempt claims which conflict with the provisions of the ICA and SEC Regulations. *See* Time Warner, 66 F.3d at 878 (Seventh Circuit determined that FCC regulation preempted conflicting state cause of action even though the federal statute pursuant to which the regulation was adopted "envisioned a regulatory regime in which cable operators would be subject both to federal requirements...and, at the same time, to the requirements of certain state consumer protection laws").

defendants employ is *required* either by the ICA or the SEC Regulations. (There is no allegation, for example, that federal law requires that the NAV of foreign portfolio securities must be adjusted to reflect *every* movement in the U.S. domestic securities market.) Conversely, the Complaint fails to allege that the manner in which defendants calculate NAV *violates* any requirement or prohibition of federal law. Thus, plaintiff's claims fail to state a legally cognizable claim.

## IV. IF THE CLAIMS IN COUNTS II AND III OF THE COMPLAINT COULD BE CHARACTERIZED AS CLAIMS FOR DIRECT SHAREHOLDER INJURY, THE CLAIMS WOULD BE BARRED BY SLUSA.

Plaintiff may attempt to avoid the demand requirement applicable to derivative actions under Massachusetts law by contending that he suffered a direct injury, distinct from the injury to Acorn Trust alleged in the Complaint. The only direct action which could be distilled from the Complaint is one based on asserted manipulative or deceptive conduct directed against "long term" Fund shareholders. (*See* Compl. ¶¶ 10, 47.). But, if the state law claims asserted in Counts II and III were construed to assert a direct shareholder claim, they would be barred by SLUSA.

In 1995, Congress passed the Private Securities Litigation Reform Act (the "PSLRA") which established uniform standards for securities fraud class actions. The PSLRA established rigorous pleading requirements for securities class actions. In re Silicon Graphics Sec. Lit., 183 F.3d 970, 974 (9th Cir. 1999); Feitelberg v. Merrill Lynch & Co., Inc., 234 F. Supp. 2d 1043, 1046 (N.D. Cal. 2002). "By 1998, however, Congress realized that many of the goals of PSLRA were being frustrated because plaintiffs were simply shifting their securities class actions from federal to state court, where the PSLRA did not restrict their claims." Riley v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 292 F.3d 1334, 1341 (11th Cir. 2002); Bertram v. Terayon Communications Sys., Inc., No. Civ 00-12653, 2001 WL 514358, at *1 (C.D. Cal. March 27, 2001) (referencing H.R. Conf. Rep. No. 105-803, at 14-15). "As a result, Congress passed the SLUSA, which amended the Securities Act of 1933 and the Securities Exchange Act of 1934 and made federal court, with limited

13

exceptions, the *sole venue* for class actions alleging fraud in the purchase and sale of covered securities." Behlen v. Merrill Lynch, 311 F.3d 1087, 1091-92 (11th Cir. 2002) (emphasis added).

SLUSA provides for the removal, preemption, *and dismissal* of any "covered class action based on the statutory or common law of any State or subdivision thereof" alleging:

> (A)   a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security; or
>
> (B)   that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security.

15 U.S.C. §§ 78bb(f)(1). *See* Behlen, 311 F.3d at 1092 ("SLUSA preempts certain state law claims, allows for removal of state actions to federal court, and requires immediate dismissal of 'covered lawsuits'"); Denton v. H&R Block Fin. Advisors, Inc., No. 01 C 4185, 2001 WL 1183292, at *4 (N.D. Ill. Oct. 4, 2001) (SLUSA preempted and required dismissal of purported state law breach of fiduciary duty claim).

Thus, even if plaintiff Kelso's claims could be construed as direct, based upon alleged deceptive conduct or misrepresentations in the Fund's prospectus (Compl. ¶ 47), in marketing or promotional materials (Compl. ¶ 10), or otherwise, SLUSA would require the dismissal of such claims.

### A.   The Complaint Alleges A "Covered Class Action."

The first element of a SLUSA claim is whether a "covered class action" exists. A "covered class action" is one in which "damages are sought on behalf of more than 50 persons or prospective class members," or where "one or more named parties seek to recover damages on a representative basis on behalf of themselves and other unnamed parties similarly situated," and common questions of law and fact predominate over questions affecting individual persons or class members.

15 U.S.C. § 78bb(f)(5)(B)(i)(I) & (II). Plaintiff Kelso squarely alleges the existence of a "covered class action" within the meaning of SLUSA. (Compl. ¶¶ 39, 41-43.)

### B. A "Covered Security" Exists.

Shares of Acorn International are securities issued by an investment company registered under the ICA and thus are "covered securit[ies]," a term SLUSA borrows from Sections 18(b)(1) and (2) of the Securities Act of 1933. *See* 15 U.S.C. § 78bb(f)(5)(E); 15 U.S.C. § 77r(b)(2); <u>Lander v. Hartford Life & Annuity Ins. Co.</u>, 251 F.3d 101, 109 (2d Cir. 2001) (securities issued by a registered investment company are "covered securi[ties]").

### C. Any Supposed Misrepresentations, Omissions Or Deceptive Conduct Necessarily Were "In Connection With" The Purchase And Sale Of A Covered Security.

If and to the extent that any portion of the Complaint could be construed to assert a direct shareholder claim, that claim necessarily would satisfy the "in connection with" requirement of SLUSA. The only allegations in the Complaint which could be construed to give rise to a direct right of action for injury to Fund shareholders, as opposed to Acorn International, are those that appear to allege manipulation or deception of shareholders. For example, in the Complaint plaintiff has put at issue statements allegedly appearing in a prospectus concerning the "investment goal" of the Fund. (Compl. ¶ 47.) But an action involving alleged representations in the prospectus for a covered security necessarily is "in connection with" the purchase or sale of securities within the meaning of SLUSA. *See, e.g.*, <u>Gustafson v. Alloyd Co., Inc.</u>, 513 U.S. 561, 575 (1995) (term "'prospectus' was well understood to refer to a document soliciting the public to acquire securities from the issuer"); <u>In re Livent, Inc. Noteholders Sec. Litig.</u>, 151 F. Supp. 2d 371, 442-43 (S.D.N.Y. 2001); *see also* BLACK'S LAW DICTIONARY 1238 (7th ed. 1999) (defining "prospectus" as a "document that describes the main features of an enterprise...and that is *distributed to prospective buyers and investors*; esp. a written description of a securities offering") (emphasis added).

The "in connection with" requirement also is satisfied here because plaintiff claims the defendants wrongfully "market[ed]" Acorn International shares based on advantages to long-term buy-and-hold investors (Compl. ¶¶ 7, 10), notwithstanding the alleged adoption of ":valuation and share pricing policies that 'benefited' market timing traders...at the expense of long term shareholders." (Id. ¶ 62(d).) A claim that investors were misled as to the suitability of an investment by marketing or promotional statements satisfies the "in connection with" requirement. See Dudek v. Prudential Sec. Inc., 295 F.3d 875 (8th Cir. 2002); see also Feitelberg, 234 F. Supp. 2d at 1052.

In determining whether the "in connection with" requirement has been met, SLUSA is to be "construed not technically and restrictively, but flexibly to effectuate its remedial purposes." Falkowski v. Imation Corp., 309 F.3d 1123, 1129 (9th Cir. 2002) (*quoting* SEC v. Zanford, 525 U.S. 813, 819 (2002)). In Falkowski, the Ninth Circuit held that SLUSA's "in connection with" requirement is satisfied if the alleged misrepresentation "coincides" with a purchase or sale, or has more than a "tangential" relation to a securities transaction. Id. at 1130-31. See also Prof'l Mgmt. Assocs., Inc. Employees' Profit Sharing Plan v. KPMG LLP, 335 F.3d 800, 803 (8th Cir. 2003) (explaining that SLUSA's "in connection with" requirement "is not limited to cases involving damages claimed as a result of the purchase or sale of securities"). Plaintiff cannot dispute that any purported misrepresentation on which he may seek to predicate a claim occurred "in connection with"--*i.e.*, "coincided" with or was at least "tangentially" related to, the purchase or sale of securities by members of the putative plaintiff class. See Feitelberg, 234 F. Supp. 2d at 1051-52 (the court rejected plaintiff's argument that the "in connection with" requirement was not met because "the focus of his complaint [was] on the company's internal operations and not the purchase or sale of stock by shareholders"); Zoren v. Genesis Energy, L.P., 195 F. Supp. 2d 598, 603 (D. Del. 2002)

("[a]lthough [plaintiff] was the master of his complaint, the court may not ignore his allegations nor Congress' intent to broadly regulate the securities arena").

Finally, plaintiff cannot avoid SLUSA by characterizing all the members of the putative class as "holders" of securities, rather than "purchasers or sellers." Indeed, the putative class alleged in the Complaint is *not* made up *only* of individuals who held stock for a defined period, but rather "all persons in the United States who have owned shares of Columbia Acorn International...for more than 14 days," *without any commencement date.* (Compl. ¶ 39.) *All* investors (for more than 14 continuous days) throughout the 11 year-plus existence of Acorn International necessarily includes purchasers of shares--otherwise they could not be investors.

Moreover, the Complaint does not define the class as limited *only* to those persons who purchased Acorn International shares *prior* to the conduct alleged in the Complaint and then held those shares thereafter. *See, e.g.,* Gordon v. Buntrock, No. 00 CV 303, 2000 WL 556763, at *3 (N.D. Ill. Apr. 28, 2000). Rather, the Complaint includes *every* purchaser of shares throughout the history of Acorn International who held the shares for more than 14 days. (Compl. ¶ 39.) As a matter of law, the "in connection with" requirement is satisfied as to this purported class. *See* Prof'l Mgmt. Assocs., Inc. Employees' Profit Sharing Plan, 335 F.3d at 803; Hardy v. Merrill Lynch, Pierce, Fenner & Smith, 189 F. Supp. 2d 14, 17-19 (S.D.N.Y. 2001). *Accord,* Spehar v. Fuchs, No. 02 Civ 9352, 2003 U.S. Dist. Lexis 10406, at *13-14 (S.D.N.Y. June 17, 2003). Thus, any direct claims plaintiff may claim to have should be dismissed under SLUSA.

### V. CLAIMS ASSERTED IN THE COMPLAINT ARE TIME-BARRED

The Sarbanes-Oxley Act, passed in 2001, states, in part:

> a private right of action that involves a claim of fraud, deceit, manipulation or contrivance in contravention of a regulatory requirement concerning the securities laws, as defined in section 3(a)(47) of the Securities Exchange Act of 1934 may be brought not later than the earlier of:

>   (1)   2 years after the discovery of the facts constituting the violation; or
>
>   (2)   5 years after such violation.

28 U.S.C. § 1658(b). Section 3(a)(47) of the Securities Exchange Act includes the Investment Company Act in its definition of "securities laws." 15 U.S.C. § 78c(a)(47).

At least prior to Sarbanes-Oxley, implied rights of action under the ICA were traditionally subject to a *one-year* after discovery/*three-year* from the date of violation limitations period. *See, e.g.*, Blatt v. Merrill Lynch, 916 F. Supp. 1343, 1351-52 (D. N.J. 1996) (applying the one-year/three-year limitations period to claims under Section 7(d) of the ICA); Freidlob v. Trustees of Alpine Mutual Fund Trust, 905 F. Supp. 843, 855-56 (D. Colo. 1995) (Sections 8, 13, 15, 17, 21 of the ICA); Merine v. Prudential-Bache Utility Fund, Inc., 859 F. Supp. 715, 721-22 (S.D.N.Y. 1994) (Section 20(a) of the ICA); Omni Fin. Corp. v. Cohen, No. 91 Civ 6837, 1994 WL 97125, at *9 (S.D.N.Y. 1994) (Section 20(a) of the ICA). Moreover, to the extent plaintiff's claims are construed as state law claims "arising under federal law" (which controls NAV calculation), then state law limitations periods apply. Sable v. Gen. Motors Corp., 90 F.3d 171 (6th Cir. 1996). Illinois applies the forum's law to procedural matters, including statutes of limitations. Telular Corp. v. Mentor Graphics Corp., 282 F. Supp. 2d 869, 871 (N.D. Ill. 2003). Under Illinois law, the statute of limitations for a common law negligence claim is governed by the five-year limitations period for civil actions set forth in 735 ILCS 5/13-205.

Under each of these limitations periods, claims asserted in the Complaint—potentially including plaintiff Kelso's claim—would be time-barred.

## CONCLUSION

For all of the foregoing reasons, Columbia Acorn Trust respectfully requests that the Court grant its motion and dismiss the claims alleged against it for failure to state a claim upon which relief can be granted.

Dated:  January 12, 2004

                                                Respectfully submitted,

                                                COLUMBIA ACORN TRUST

                                                By: _____
                                                        One of Its Attorneys

Gordon R. Broom-#00308447
Troy A. Bozarth-#06236748
Regina L. L. Wells-#06278688
Burroughs, Hepler, Broom,
 MacDonald, Hebrank & True, LLP
103 West Vandalia Street, Suite 300
Edwardsville, IL 62025
(618) 656-0184
(618) 656-1364 facsimile

John W. Rotunno
Kenneth E. Rechtoris
Daniel J. Hayes
Bell, Boyd & Lloyd LLC
70 West Madison Street, Suite 3300
Chicago, IL 60602-4207
(312) 372-1121